# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 28, 2015

## STATE OF TENNESSEE v. JEFFERY COMBS

**Appeal from the Criminal Court for Sullivan County**
**No. S61248    Robert H. Montgomery, Judge**

---

**No. E2014-01175-CCA-R3-CD – Filed May 20, 2015**

---

The Defendant, Jeffery Combs, appeals as of right from his jury convictions for eighteen counts of forgery and one count of theft of property valued at $1,000.00 or more but less than $10,000.00, for all of which he received an effective twelve-year sentence.  On appeal, the Defendant challenges only the sufficiency of the convicting evidence, arguing that his identity was not sufficiently established to support the eighteen counts of forgery; that one count of forgery was for an electronic check which he did not sign and, therefore, cannot be guilty of; that he cannot intend to steal property or defraud someone of their money if that person was known to have died; and that it was improper to aggregate the amount of each separate forgery to support the conviction for Class D felony theft.  Following our review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Steven M. Wallace, District Public Defender, and Leslie S. Hale, Assistant Public Defender (on appeal), Blountville, Tennessee; and George Todd East (at trial), Kingsport, Tennessee, for the appellant, Jeffery Combs.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Barry P. Staubus, District Attorney General; and Emily M. Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
<u>FACTUAL BACKGROUND</u>

Multiple fraudulent transactions, made during a period from February 17, 2011, to March 23, 2011, were drawn on an account of one Mary Elizabeth Kelly Combs ("Betty Combs or Ms. Combs"), who had died in August 2010. After the ensuing investigation, the Defendant, Ms. Combs's son, was charged with eighteen counts of forgery and one count of Class D felony theft. See Tenn. Code Ann. §§ 39-14-103, -105, -114. He proceeded to trial in February 2014.

Crystal Nottingham, Senior Fraud Prevention Coordinator for Eastman Credit Union, testified that the sole owner of the account in question was Mary E. Combs and that no one else was authorized to make transactions on that account. According to Ms. Nottingham, upon Ms. Combs's death, the account would have gone into her estate given that there was no beneficiary listed. A signature card for the account, reflecting the signature of Betty Combs, was entered as an exhibit to Ms. Nottingham's testimony.

Mr. James P. Kelly, the executor of Ms. Combs's estate, went into the credit union in March 2011 and reported to Ms. Nottingham that he believed someone had been making fraudulent transactions on the account. According to Ms. Nottingham, Mr. Kelly presented the death certificate and the letter of testamentary from Ms. Combs. They then reviewed multiple transactions to determine if fraud had in fact occurred. Eighteen of the checks that Ms. Nottingham reviewed with Mr. Kelly that day were admitted into evidence: (1) check no. 1351, dated February 17, 2011, written to Wal-Mart for $20.00, showing Betty Combs's signature; (2) check no. 1356, dated February 17, 2011, written to Ingles for $109.50, showing Betty Combs's signature and a Tennessee driver's license number 074433276 across the top; (3) check no. 1357, dated February 17, 2011, written to Ingles for $108.18, showing Betty Combs's signature and a Tennessee driver's license number 074433276 across the top; (4) check no. 1362, dated February 21, 2011, written to The Chop House for $100.00, showing Betty Combs's signature; (5) check no. 1363, dated February 21, 2011, written to Ingles for $83.61, showing Betty Combs's signature and a Tennessee driver's license number 074433276 across the top; (6) check no. 1364, dated February 21, 2011, written to Ingles for $102.10, showing Betty Combs's signature; (7) check no. 1365, dated February 23, 2011, written to Ingles for $159.67, showing Betty Combs's signature and a Tennessee driver's license number 074433276 across the top; (8) check no. 1366, dated February 24, 2011, written to Ingles for $112.02, showing Betty Combs's signature and a Tennessee driver's license number 074433276 across the top; (9) check no. 1376, dated February 28, 2011, written to Ingles for $131.40, showing Betty Combs's signature and a Tennessee driver's license number 074433274 across the top; (10) check no. 1380, dated February 28, 2011, written to IGA for $77.72, showing Betty Combs's signature and a Tennessee driver's license number 074433274 across the top; (11) electronic check no. 1381, dated March 23, 2011, to Burlington Store #108 for $200.00, stating, "This Draft Authorized by Your Depositor,

NO SIGNATURE REQUIRED"; (12) check no. 1382, dated February 28, 2011, written to The Chop House for $200.00, showing Betty Combs's signature; (13) check no. 1384, dated February 28, 2011, written to IGA for $117.36, showing Betty Combs's signature and a Tennessee driver's license number 074433274 across the top; (14) check no. 1385, dated February 28, 2011, written to Wal-Mart for $40.00, showing Betty Combs's signature and a Tennessee driver's license number 074433274 across the top; (15) check no. 1394, dated March 2, 2011, written to IGA for $108.49, showing Betty Combs's signature and a Tennessee driver's license number 074433276 across the top; (16) check no. 1395, dated March 6, 2011, written to IGA for $99.62, showing Betty Combs's signature and a Tennessee driver's license number 074433273 across the top; (17) check no. 1397, dated March 6, 2011, written to IGA for $108.00, showing Betty Combs's signature and a Tennessee driver's license number 074433273 across the top; and (18) check no. 1400, dated either March 2 or 7, 2011,[1] written to Zoomers for $70.36, showing Betty Combs's signature and a Tennessee driver's license number 074433273 across the top.

Ms. Nottingham testified that some checks were returned due to insufficient funds in the account; however, the remaining checks that were paid by the credit union were treated as forged checks, and those amounts were credited back into Ms. Combs's account, according to Ms. Nottingham. The aggregate amount of these eighteen checks was $1,947.99. Ms. Nottingham stated that "the merchants [were] at a loss for all of them." Normally, once an account has been compromised, that account is closed, according to Ms. Nottingham, although she did not have the exact date of closure for this account.

Corporal Ed Ragsdale of the Kingsport Police Department testified that he was assigned as a detective to investigate these fraudulent checks on Ms. Combs's account. Cpl. Ragsdale originally met with Mr. Kelly, the executor, who provided him with copies of the checks, all of which were passed at local Kingsport businesses. After reviewing these checks and speaking with Mr. Kelly, the Defendant was identified as a suspect, according to Cpl. Ragsdale. Cpl. Ragsdale stated that he attempted to get footage from video surveillance cameras from each of the locations where the checks were passed, but he was only able to obtain security footage from IGA because either the other businesses did not have video surveillance cameras or their equipment was broken during the relevant time frame. Cpl. Ragsdale stated that he had previous photographs of the Defendant and viewed the footage provided. Cpl. Ragsdale testified that he also interviewed the Defendant's sister, Angie Roberts, and showed her the security footage as well as pictures developed from that footage.

---

[1] The exact date is unclear from the check.

Cpl. Ragsdale confirmed that the Defendant's address as listed on his driver's license was "in proximity to the center of Kingsport pretty much." He also noted that the driver's license number given on many of the checks was the same except for the last number, which was either a 3, 4, or 6. According to Cpl. Ragsdale, none of the given driver's license numbers ending in a 3, 4, or 6 were registered to a person in Tennessee, and the Defendant's driver's license number was 074433278, which was the same to those given on the checks except for the last number. A certified copy of the Defendant's driving history was entered as an exhibit to Cpl. Ragsdale's testimony.

Charles Robinette testified that he was a district manager for "Houchens Industries, IGA, and Price Less Foods." During the relevant time period, he was the store manager of the IGA in Kingsport. He was contacted by the Kingsport Police Department regarding the fraudulent checks and provided the police with security footage corresponding to the dates and the amounts of those checks. Video recordings of three separate transactions were played for the jury—one from March 2, 2011, and two from March 6, 2011.

Mr. Robinette was also able to procure the receipts from those transactions. Those three receipts were entered into evidence. The first receipt showed a $108.49-purchase made on March 2, 2011, at 4:52 p.m. for two cartons of cigarettes—one box of "MARL BP MN KG FILT" and one box of "NEWPORT 100S BOX CARTON." The next receipt reflected a purchase of two cartons of "MARL BP KING BOX" for $99.62 at 5:22 p.m. on March 6, 2011. The third receipt showed a $108.00-purchase of two $50.00 Verizon gift cards made later on March 6, 2011, at 6:50 p.m.

On cross-examination, Mr. Robinette was asked about the March 6, 2011 receipt for two cartons of "MARL BP KING BOX." When asked what kind of Marlboro cigarettes these were, Mr. Robinette stated that these cigarettes were "[m]ore than likely . . . going to be probably the Reds in a box"; he based this likelihood on the location from which the clerk retrieved the cartons off the shelf. Mr. Robinette was unable to tell from the video recording the exact color on the box of Marlboro cigarettes, which came in an array of colors, according to Mr. Robinette.

Mr. Robinette testified that, pursuant to policy, IGA employees were supposed to get a driver's license number when issued a check and were supposed to match the name on the check with the driver's license. However, he was unable to confirm that IGA employees did this "every time" as instructed. It appeared from one of the video clips that the license number was already written on the check when it was presented to the IGA employee.

James P. Kelly, the executor of the Betty Combs's estate, was the last witness to testify for the State. Mr. Kelly was Ms. Combs's brother and the Defendant's uncle. A death certificate was entered as an exhibit to Mr. Kelly's testimony, which reflected that Mary Elizabeth Kelly Combs died on August 26, 2010. Mr. Kelly testified that Ms. Combs's will named her three children as beneficiaries to her estate—the Defendant, Angie Roberts, and Kelly Combs. The Defendant was present at his mother's funeral, according to Mr. Kelly.

Ms. Combs owned a condominium in Kingsport, which Mr. Kelly intended on selling for the estate. Mr. Kelly stated that "the bulk" of Ms. Combs's "personal property [or] tangible things" was kept in the condominium after her death; he stated that he took some of Ms. Combs's jewelry from the condominium, which he intended to distribute later. He was unaware of any checkbooks left at the residence. Regarding the distribution of Ms. Combs's personal property, Mr. Kelly conveyed, "[The heirs] agreed to take whatever they had felt that their mother had designated for them or what they wanted. So that worked real well." Mr. Kelly agreed that the three children "would have kind of just had access, been in agreement . . . to take whatever property they wanted[.]" According to Mr. Kelly, he was not aware of any burglary or theft at the condominium during the relevant time period.

Mr. Kelly confirmed that he had a set of keys to the condominium and that the lawyer for the estate also had a set. According to Mr. Kelly, the condominium needed to be renovated before it could be sold, so "there were instances where" work had to be performed, and either he or the lawyer would provide keys to the necessary personnel. The Defendant agreed to help with the renovations, which included painting, installing a new stove, and other "odds and ends[.]" Mr. Kelly was unsure if the Defendant was alone during these time periods.

According to Mr. Kelly, both Ms. Combs's mortgage payment and the electric bill came out of the Eastman Credit Union account, so he left the account open and "put monies in as needed as the months went on." He monitored the account online and eventually discovered that there had been some fraudulent transactions. Mr. Kelly stated that he never wrote checks from that account and that no one else was authorized to do so. Mr. Kelly was unaware that any other checks for the account existed because he had destroyed all of the checks that he had access to.

Mr. Kelly was shown the video clips from IGA, but he was unable to positively identify the individual depicted therein, who was wearing a baseball cap, as the Defendant. He confirmed that the person in the recordings was of the same sex and race as the Defendant and that the individual was of similar age and build. Mr. Kelly agreed

-5-

that the individual in the recordings was neither of the other two heirs, Angie Roberts or Kelly Combs.

The Defendant called his sister, Angie Roberts, as his only witness. Ms. Roberts testified that Cpl. Ragsdale did not show her any video recordings of the suspect but only showed her "a picture on a computer screen." According to Ms. Roberts, she was not able to identify this individual for Cpl. Ragsdale. Furthermore, she "couldn't say at 100% certain[,]" or even that it was "more likely than not[,]" that the picture shown to her by Cpl. Ragsdale was her brother.

She was then shown the first video clip and responded, "No, that is not my brother[,]" and that there was "no doubt" in her mind. She was not able to identify her brother in either of the additional clips. According to Ms. Roberts, this was the first time she had seen the recordings. She testified that the Defendant usually stood with "his hand on his hip[,]" which was different from how the individual in the video was standing with his feet crossed. She further stated that the Defendant smoked "Marlboro Special Blend[,]" which were "the gold kind[,]" and that she had never known her brother to buy a carton of cigarettes, only packs.

On cross-examination, Ms. Roberts was asked if the individual could be her brother, and she equivocated, "I would say that it was a man, that's what I would say. I could tell that it was a—a man or a boy." Ms. Roberts confirmed that she saw her brother often and, at times, had "helped him cover some bills[.]" She reiterated that she did not tell Cpl. Ragsdale that she "was almost certain" that the individual in the photograph was her brother. According to Ms. Roberts, she asked if Cpl. Ragsdale had a better picture where she could see the individual's face.

When asked about the type of clothing her brother would wear, Ms. Roberts said that the clothing of the person in the video was consistent with her brother's style of dress, although she could not identify the particular clothes as belonging to the Defendant. She also stated that she had seen a baseball cap similar to the one in the video clips before in a box of the Defendant's "stuff" but that she had also "seen another person . . . that ha[d] that same hat." She confirmed that her brother was a smoker during the relevant time frame.

Ms. Roberts was shown the fraudulent checks and stated that the signature looked like her mother's handwriting. Ms. Roberts said that she had no criminal record, not even a speeding ticket. On redirect, Ms. Roberts testified that she believed that the condominium was "completely empty" when her brother painted it.

Cpl. Ragsdale was called by the State in rebuttal, and he contradicted Ms. Roberts' testimony. Cpl. Ragsdale said that he reviewed the video clips and the "still images" with Ms. Roberts and that, after taking as much time as she needed, she said that she "was almost positive that it was her brother[.]" He agreed that she did ask for "another clearer picture[,]" which he was unable to provide.

Following the conclusion of the proof, the jury found the Defendant guilty as charged. Thereafter, the trial court imposed concurrent terms of six years for each forgery conviction and twelve years for the Class D felony theft conviction as a Range III, persistent offender, to be served at 45%. This timely appeal followed.

## ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence supporting his convictions. An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant makes multiple factual challenges to the sufficiency of the convicting evidence for his eighteen forgery convictions. Specifically, he argues as follows: (1) that there was no surveillance video available for any of the checks except for the three that were passed at IGA; (2) that he could not be positively identified in the IGA video clips by either his uncle or his sister, that his sister was a credible witness with no criminal history, and that the "video clip itself [was] not sufficient to justify a conviction"; (3) that there was no proof from the recordings or otherwise that he signed his mother's name on seventeen of the checks, that his sister testified that the signature looked like her mother's handwriting, and that he was not charged with passing or uttering the checks; (4) that there was no proof that he had access to any of the checks because his uncle believed that the checks had been destroyed, because the attorney also had a set of keys and keys were given to workmen, and because his sister testified that she believed the condominium was empty when the Defendant painted it; (5) that, because his sister helped him pay bills, it was plausible his mother had also helped him pay bills and, therefore, that his "license number could have been available to third parties"; (6) that his sister testified that she also knew someone else who had a baseball cap like the one in the video clips and that she was unable to recognize the clothing worn by the individual in those recordings; (7) that he smoked a different type of cigarettes than those purchased at IGA and usually bought cigarettes by the pack not the carton; (8) that "the evidence about the license numbers [was] not sufficient to support the conviction[s]" because "any license presented should have been identification information for Betty Combs, not [the Defendant]"; (8) that there was no proof that he intended to defraud his mother because he was aware that she was deceased and "that he could not defraud a person known to be deceased" and, furthermore, that "his mother no longer legally owned the account monies by the time the checks were passed"; and (9) regarding count 11, that it was a draft, not a check, to Burlington with no signature required and that it bore "[neither] handwriting from any source" nor information as to who received the $200.00.

A person commits forgery who "forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 39-14-114(a). As relevant here, "forge" means to:

> (b)(1)(A) Alter, make, complete, execute or authenticate any writing
> so that it purports to:
> (i) Be the act of another who did not authorize that act;
> . . . .
> (C) Issue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A); or
> (D) Possess a writing that is forged within the meaning of subdivision (b)(1)(A) with intent to utter it in a manner specified in

subdivision (b)(1)(C)[.]

Tenn. Code Ann. § 39-14-114(b)(1). "A forged check is uttered or transferred by the action of presenting it for payment." State v. McDowell, 664 S.W.2d 310, 313 (Tenn. Crim. App. 1983) (citing Girdley v. State, 29 S.W.2d 255 (Tenn. 1930)).

The crux of many of the Defendant's allegations outlined above is that there was little proof to positively identify him as the individual who passed the forged checks. "It is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). Furthermore, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing Strickland, 885 S.W.2d at 87-88).

The Defendant makes much ado that neither his sister nor uncle was able to identify him from the video clips shown at trial and that video recordings from the other businesses did not exist. However, this argument presupposes that his identity must be established conclusively by direct evidence in the form of a video recording from surveillance footage. He also contends that his sister was a credible witness and that her testimony that it was not him in the video should have been believed by any rational juror. Again, credibility determinations are for the jury, not for this court.

Ms. Roberts' testimony was contradicted by Cpl. Ragsdale. Cpl. Ragsdale stated that Ms. Roberts was shown the video clips and several photographs and that, after sufficient time to view those items, she positively stated that the Defendant was the individual therein. Cpl. Ragsdale did not dispute that the individual's face was covered by a baseball cap in the recordings and that the Defendant's sister asked for additional images of the person's face, but Cpl. Ragsdale maintained that she was still able to identify the Defendant. The jury, as was their prerogative, accredited Cpl. Ragsdale's testimony. Moreover, the jury was able to view the video clips and compare the individual with the Defendant's appearance, and the Defendant's uncle confirmed that the individual in the recordings was of the same race and sex as the Defendant and was of similar age and build.

The Defendant notes that his sister testified that she knew someone else who had a hat just like the one worn in the videos and that she could not identify the clothing worn by the individual as the Defendant's. However, the Defendant fails to observe that Ms.

-9-

Roberts also testified that she saw a baseball cap like the one in the video clips in a box of the Defendant's belongings and that she opined that the clothing worn by the person was similar to the Defendant's style of dress. He also comments that he did not smoke the type of cigarettes purchased by the individual and that he only bought cigarettes by the pack. However, this testimony was of marginal relevance given that it was established that he was a smoker and that three different kinds of cartons of cigarettes were purchased at IGA.

The Defendant also argues that there was no proof that he was the person who affixed Betty Combs's signature to the seventeen checks. He can be seen in the recordings writing on the checks that were presented at IGA. Although he contends that it was possibly his mother's signature on the checks, it is highly unlikely that she signed seventeen checks, not in numerical sequence, prior to her death to help the Defendant pay his bills, as the Defendant posits. There was testimony that the Defendant's sister helped him pay bills sometimes, but none that his mother ever did so. The Defendant's contentions reject all plausible inferences in favor of the State and carry the testimony presented at trial to illogical extremes.

As observed by the Defendant, thirteen of the checks had a driver's license number written on them, which was similar to the Defendant's number in every way except for the very last number. Nonetheless, he submits that this evidence was insufficient to establish his identity because there was little proof he had access to the checks and that someone else may have had access to his driver's license number if his mother had also helped him pay bills. Mr. Kelly testified that all three children had access to Ms. Combs's condominium after her death to divide her personal items and that the division took place amicably. Also according to Mr. Kelly, the Defendant was allowed inside the residence to do renovations to ready the property for resale. The jury again was free to reject testimony that the property was "completely empty" when the Defendant worked on the condominium. Testimony established that the Defendant had sufficient access to the checks.

The Defendant also contends that any employee who checked his license would have been able to see that he was not Betty Combs, the identified owner of the account on the checks, and would likely not have accepted the check. However, on one of the video clips the Defendant can be seen presenting a check that already had a driver's license number written on it, presumably in an effort to defraud the cashier. Evidence that the Defendant's driver's license number appeared on thirteen of the checks, except that the last number was altered, was strong evidence of his identity as the individual who passed these checks. He offers no rational explanation why a third party would need to alter the last number of his driver's license number in order for that third party to avoid detection.

-10-

It was also a rational inference for the jury to conclude that the Defendant passed the additional five instruments, including count 11, the electronic check, that did not contain any driver's license number or identifying information given that he was adequately identified, from the evidence cited above, as passing thirteen such checks from the same account and during the same time period. We conclude that the Defendant's identity was sufficiently established through circumstantial evidence.

Regarding count 11, the Defendant contends that, because the document displayed "[no] handwriting from any source[,]" and because the presentment charged that he forged Betty Combs's signature to the document, the evidence was insufficient to support that conviction. As noted above, "forge" is defined in Tennessee Code Annotated section 39-14-114(b)(1)(A) as to "[a]lter, make, complete, execute or authenticate any writing so that it purports to . . . [b]e the act of another who did not authorize that act" or in subsection (b)(1)(C) to "[i]ssue, transfer, register the transfer of, pass, publish, or otherwise utter a writing that is forged within the meaning of subdivision (b)(1)(A)[.]" A "writing" includes "printing or any other method of recording information, money, coins, tokens, stamps, seals, credit cards, badges, trademarks, and symbols of value, right, privilege or identification." Tenn. Code Ann. § 39-14-114(b)(2). These definitions encompass the electronic check passed by the Defendant. Moreover, as also noted above, "[a] forged check is uttered or transferred by the action of presenting it for payment." McDowell, 664 S.W.2d at 313 (citation omitted). The proof was sufficient to establish the elements of the offense charged in count 11.

The Defendant's argument could also be construed as one alleging that a fatal variance existed between the evidence presented at trial and the elements of the offense as charged in the presentment for count 11. See State v. March, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008). Specifically, a variance is not fatal "if (1) the defendant is sufficiently informed of the charges levied against him so that he can adequately prepare for trial and, (2) the defendant is protected against a subsequent prosecution for the same offense based on double jeopardy grounds." State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993) (citations omitted). A variance occurs "only if the prosecutor has attempted to rely upon theories and evidence at the trial that were not fairly embraced in the allegations made in the charging instrument." State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000).

We conclude that there was no variance between the presentment on count 11 and the proof at trial. Here, the presentment provided the date, the number, the place, and the amount of the check, the account on which the check was written, the owner of the account, and alleged forgery of the check and referenced the appropriate statute.

-11-

Accordingly, the Defendant was sufficiently informed of the charge to allow him to prepare for trial and protected against subsequent prosecution.

Finally, the Defendant argues that the State failed to establish the relevant mens rea for forgery, i.e., that he had no intent to commit the forgeries because he could not have intended to defraud a known dead person. Initially, as noted, but then ignored, by the Defendant in his appellate brief, the presentment charged the Defendant with the intent to defraud Eastman Credit Union, each individual business, and Betty Combs. The forgeries were complete when the writings were executed, which obviously was done with the intent to defraud. See State v. James, 688 S.W.2d 463, 466 (Tenn. Crim. App. 1984) ("The offense is complete by the forgery with fraudulent intent, whether any third person be actually injured or not."). "It is sufficient the instrument forged, with the fraudulent intent, might have been prejudicial to the rights of another." Id. (citation omitted).

Clearly, the intent was to defraud the businesses and the credit union as well as Ms. Combs's estate. Ms. Nottingham testified that some checks were never paid out of the account due to insufficient funds and that those that were paid were refunded to Ms. Combs's account. According to Ms. Nottingham, it was ultimately the individual businesses that suffered the losses for all eighteen of these checks, thus, clearly being harmed by the Defendant's actions. The fact that money was taken from Ms. Combs's estate rather than Ms. Combs is of little consequence. As we concluded above, the presentment adequately informed the Defendant of the charges against him. Mr. Kelly was named as the personal representative for the estate, and Ms. Combs's personal property vested with her representative upon her death. See Tenn. Code Ann. § 31-2-103. Mr. Kelly testified that he did not authorize the Defendant to make any of the eighteen transactions from the decedent's account. There was sufficient evidence in the record to indicate that the Defendant intended to deceive and defraud others when he executed the forged instruments.

Based on the evidence presented at trial, a reasonable juror could have concluded that Defendant committed all eighteen acts of forgery. He is not entitled to relief on this issue.

Suffice to say, the Defendant also challenges the sufficiency of the evidence supporting his theft conviction. To support the Defendant's conviction for theft of property valued at $1,000.00 or more but less than $10,000.00, the State was required to prove that Defendant violated Tennessee Code Annotated section 39-14-103, which states: "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over property without the

-12-

owner's effective consent." This count referenced the taking of money from Betty Combs, and the Defendant again argues that he could not intend to deprive a known dead person of her property and notes that he was her heir under the will. However, we similarly dispense with this argument as we did so above; the fact that the presentment gave the name of the decedent rather than the decedent's estate is of little consequence once again. The Defendant was adequately advised of the charge against him in this count, being provided with the time frame, the property taken, the person from whom it was taken, and reference was made to the appropriate statute. We conclude that the property was of the "same ownership" as it passed to Ms. Combs's personal representative upon her death. See, e.g., State v. Sterett, 295 P. 182, 185 (Wash. 1931) ("[The defendant] did appropriate, as the jury was fully warranted in finding under the evidence, the sum of $50 belonging either to Horn or to Horn's estate, which, for present purposes, we think should be held to be the same ownership."). Again, Mr. Kelly testified that he did not authorize any of the transactions, and the Defendant cannot misappropriate those funds simply because he was one of three named beneficiaries in Ms. Combs's will.

Finally, with regard to the theft count, the Defendant contends that it was error to aggregate the amount of the eighteen checks ($1,947.99). Theft of property is a Class D felony if the value of the property obtained is $1,000.00 or more but less than $10,000.00. Tenn. Code Ann. § 39-14-105(3). The State may aggregate the value of stolen property taken in separate thefts "when separate acts of theft are: (1) from the same owner; (2) from the same location; and (3) are pursuant to continuing criminal impulse or a single sustained larcenous scheme." State v. Cattone, 968 S.W.2d 277, 279 (Tenn. 1998) (citing State v. Byrd, 968 S.W.3d 290, 291 (Tenn. 1998)); see also State v. Nelson, 344 S.W.2d 540, 542 (Tenn. 1960) ("[W]here it appears that successive takings are actuated by a single, continuing, criminal impulse or intent or are pursuant to the execution of a general larcenous scheme, it has been held . . . that such successive takings constitute a single larceny, regardless of the extent of the time which may have elapsed between takings."). Whether a series of successive takings constitute "several thefts or one single crime must be determined by the particular facts and circumstances of each case." Nelson, 344 S.W.2d at 542.

The forgeries in this case occurred during a period of about a month and were all drawn on the same account of Ms. Combs's. We think it clear from the proof presented at trial that the State sufficiently established that the Defendant's conduct was part of a single, continuous larcenous scheme. The Defendant submits that the "alleged forgeries were involving value loss from the individual businesses" at different times and at different locations and that, therefore, aggregation was improper. He relies on our supreme court's decision in Cattone, 968 S.W.2d 277, and argues "that the value of stolen

-13-

services from different owners cannot be aggregated to upgrade the offense." However, this case is factually different from <u>Cattone</u> because this case does not involve the aggregation of stolen <u>services</u> from different owners.

Here, the <u>property</u> alleged to have been taken was from the same location and belonged to the same owner, i.e., currency from Ms. Combs's Eastman Credit Union account. The Defendant observes that Ms. Combs's estate and the credit union ultimately suffered no loss. However, the Defendant will not be rewarded just because the Defendant was found out and the money returned to Ms. Combs's account, resulting in financial losses to the businesses alone. Such facts are immaterial as to whether he intended to deprive her account of the money at the time he passed the checks. Aggregation was appropriate, and the Defendant is not entitled to relief. <u>See, e.g.</u>, <u>State v. Kenna Jean Parrott</u>, No. M2004-00723-CCA-R3-CD, 2005 WL 1848481, at *7-8 (Tenn. Crim. App. Aug. 5, 2005) (deeming evidence sufficient to support theft of property conviction over $60,000.00 where for a period of nine months, which corresponded with defendant's term of employment, approximately 272 checks were issued to another individual totaling in excess of $60,000.00, over 200 of which were signed by defendant as weigh master).

## CONCLUSION

Based upon the foregoing reasoning and authorities, we conclude that the evidence was sufficient to support the Defendant's convictions and affirm the judgments of the trial court.

_____
D. KELLY THOMAS, JR., JUDGE